**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| DAPHNE DAVIS, | : | Case No. 3:18-cv-253 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.     <u>Introduction</u>

After Plaintiff Daphne Davis worked for many years in the food-service industry, she began having significant problems with her right knee. Unfortunately, conservative treatments were unsuccessful and she underwent a total knee replacement. After surgery, Plaintiff was unable to continue working fulltime and applied for period of disability, Disability Insurance Benefits, and Supplemental Security Income. Her claims were denied initially and upon reconsideration. After a hearing, Administrative Law Judge (ALJ) Emily Ruth Statum concluded that Plaintiff was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The Appeals Council denied Plaintiff's request for review, and she filed a previous action in United States District Court for the Southern District of Ohio. Upon the parties'

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Joint Motion to Remand, the Court vacated the Commissioner's decision and remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. *See Davis v. Commissioner of Social Security*, 3:16cv11 (S.D. Ohio July 11, 2016) (Rice, D.J.).

Upon remand, Plaintiff achieved partial success: ALJ Elizabeth A. Motta found that she was under a disability beginning on April 20, 2016 but was not disabled within the meaning of the Social Security Act prior to that date. Thus, only the period of time between June 18, 2012 and April 20, 2016 is at issue in this case.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #13), the Commissioner's Memorandum in Opposition (Doc. #14), Plaintiff's Reply (Doc. #15), and the administrative record (Doc. #10).

## II.    **Background**

Plaintiff asserts that she has been under a "disability" since June 8, 2012. She was forty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). On April 21, 2016, Plaintiff turned fifty years old and was accordingly a person "closely approaching advanced age." *See id.* §§ 404.1563(d), 416.963(d). She has a ninth-grade—or "limited"—education. *See id.* §§ 404.1564(b)(3), 416.964(b)(3).[2]

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

### A.     Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Motta that she has had four knee surgeries, including a total knee replacement and cyst removal.  (Doc. #10, *PageID* #1846).  She had knee-replacement surgery in 2012 and "it's been a problem since."  *Id.* at 1847.  She is not able to walk normally, she has back and knee pain, and she cannot fully straighten her leg.  *Id.* at 1851.  After surgery, Plaintiff attended physical therapy until her insurance stopped covering it.  *Id.* at 1859.  She wanted more physical therapy because it helped straighten her leg.  *Id.*

She still has swelling in her knee and leg.  She was prescribed special stockings to eliminate swelling.  *Id.* at 1860.  Three or four years before the hearing, her family-care doctor, Dr. Brown, prescribed a cane because of Plaintiff's difficulty walking and so that she would not fall.  *Id.* at 1847.  Luckily, she has not fallen because she always uses her cane.  *Id.* at 1861.  Plaintiff also uses a brace to help her walk.  *Id.* at 1860.  At the grocery store, she uses an electric cart because she does not want to fall.

In addition, Plaintiff has problems with her left shoulder.  She had surgery to repair a torn ligament in it in November 2016, about a month before the hearing.  *Id.* at 1850.  It was still sore at the hearing.  *Id.*

Plaintiff has sciatic nerve problems that cause pain in her mid-back.  *Id.* at 1848.  As a result, she has trouble sitting in hard chairs.  *Id.*  Fortunately, her work gave her a soft chair to sit in.  *Id.*  Plaintiff takes Percocet for pain and has had cortisone shots in the past.  *Id.* at 1850.

Plaintiff has sleep apnea and has to use a CPAP machine every night. *Id.* at 1848-49. She also has some breathing problems and uses inhalers and a breathing machine. *Id.* at 1853.

Plaintiff struggles with depression. Her former doctor prescribed her medication. *Id.* at 1851. However, he stopped accepting CareSource, her health insurance. At the time of the hearing, she was seeing Victoria Brookshire, a nurse practitioner in Huber Heights. *Id.* at 1849. Plaintiff believes she will prescribe medications in the future. *Id.* at 1851. Plaintiff sought some treatment from Samaritan Behavioral Health but has not been there since 2014. *Id.* at 1852.

Plaintiff lives in an apartment with her 18-year-old daughter. *Id.* at 1841. She usually drives to her part-time job three times a week. *Id.* If she needs to go anywhere else, her mother drives her. *Id.* at 1841-42. Plaintiff does not leave her apartment as much as she used to but her mother and sister try to get her out when they can. *Id.* at 1856. She visits with them and goes to church on Sundays. *Id.* at 1856-57. When asked if she had a significant other, boyfriend, or anything like that, Plaintiff responded, "Not really. I don't call him that." *Id.* at 1856.

During the day, she reads her Jehovah book, watches TV, and plays games on her phone. *Id.* at 1857-58. She is generally able to use a computer. *Id.* at 1857. After her shoulder surgery, she had to use a long stick to help her type so that she did not have to move her arm. *Id.* She can take a bath or shower but it was more difficult after her shoulder surgery. *Id.* After surgery, she had a "home care lady" helping her but her doctor told her they were too much. For the most part, Plaintiff can dress herself. *Id.* at

1857. She has trouble putting on stockings. *Id.* At the time of the hearing, her sister

helped her get dressed for work. *Id.* Her daughter does most of the chores around the

apartment, including preparing meals and doing laundry. *Id.* at 1855-56. Plaintiff is able

to go to the store but uses an electric cart. *Id.* at 1856.

Plaintiff has worked at many restaurants. For example, she worked at KFC as a

shift manager and assistant manager. *Id.* at 1843. She also worked for Golden Corral,

Taco Bell, Lee's Famous Recipe, and Wendy's. *Id.* at 1844. At the time of the hearing,

she was working as a receptionist at Extended Stay America. *Id.* at 1845. She usually

worked about 8 hours a day, 3 days a week, for a total of 23 to 24 hours. *Id.* at 1845,

1854. She checks people in and directs them to their rooms. *Id.* at 1884. She spends

most of her time at work sitting. *Id.* at 1854. However, she cannot sit continuously for

hours at a time and has to get up and move around a little bit before sitting back down.

*Id.* at 1859. If her employer offered her more hours, she would not take them because she

does not think she would be able to work more. *Id.* She has to go to work in pain

because she cannot take her medications and be able to function. *Id.* When she gets

home, she takes her medication to make it through the rest of the day. *Id.* at 1860.

### B.      Medical Opinions

####         i.      *Morris Brown, M.D.*

Plaintiff's primary-care physician, Dr. Brown, completed a medical functional

capacity assessment and a basic medical assessment in September 2011 (almost a year

before Plaintiff's amended alleged onset date). He opined that Plaintiff was markedly

limited in every functional category. *Id.* at 2545. He indicated that she had a right

meniscal tear that required surgery. *Id.* at 2546. Her health status was poor but stable. *Id.* He concluded that her limitations were expected to last twelve or more months and Plaintiff was unemployable. *Id.* at 2545.

On January 21, 2014, Dr. Brown indicated in his treatment notes that Plaintiff reported sharp pain in her lumbar spine and right knee. *Id.* at 1556. The pain interfered with her sleep and work. *Id.* It was present for more than twelve months. *Id.* Dr. Brown concluded that she cannot sit for more than ten minutes, cannot work, and is permanently disabled. *Id.* at 1558.

### ii. *Amita Oza, M.D.*

Dr. Oza examined Plaintiff on January 6, 2012. She found, "[Plaintiff] is a 45-year-old female patient who had injury to her right knee status post two surgeries, now has significant arthritis with constant swelling and pain." *Id.* at 684. Based on her examination, Dr. Oza opined that Plaintiff could do sedentary work with a change in position every fifteen to twenty minutes. *Id.*

### iii. *William Bolz, M.D., Esberdado Villanueva, M.D., Caroline Lewin, Ph.D.*

Dr. Bolz reviewed Plaintiff records in November 2012. He found that Plaintiff has one non-severe impairment, asthma, and two severe impairments—reconstructive surgery of a weight bearing joint and essential hypertension. *Id.* at 217. Dr. Bolz opined that she could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 218. She can stand and/or walk for a total of four hours—in no more than thirty-minute intervals—and sit for six hours in an eight-hour workday. *Id.* She can occasionally push

and/or pull with her right lower extremity.  *Id.*  She can never climb ladders, ropes, or scaffolds; can occasionally kneel, crouch, crawl, and climb ramps and stairs; and can frequently balance and stoop.  *Id.* at 218-19.  She should avoid concentrated exposure to vibration; avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid all exposure to hazards such as machinery and heights.  *Id.* at 219.  Dr. Bolz concluded that Plaintiff is not under a disability.  *Id.* at 221-22.

Dr. Lewin and Dr. Villanueva reviewed Plaintiff's records in January 2013.  Dr. Lewin found one additional non-severe impairment, affective disorders.  *Id.* at 246.  Dr. Villanueva affirmed Dr. Bolz's assessment.  *Id.* at 248-52.

## III.     <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir.

2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.  <u>The ALJ's Decision</u>

As noted previously, on remand it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's applications for benefits.  She did so by considering each of the

five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §

404.1520.  She reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since June
            18, 2012.

Step 2:     She has the severe impairments of degenerative changes of the
            lumbosacral spine; history of total knee replacement; mild to
            moderate degenerative changes in the right hip; mild degenerative
            changes in the left knee; and overweight to mildly obese condition.

Step 3:     She does not have an impairment or combination of impairments that
            meets or equals the severity of one in the Commissioner's Listing of
            Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her
            impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239
            (6th Cir. 2002), consists of "sedentary work … subject to the
            following limitations: (1) lifting and carrying up to 20 pounds
            occasionally and 10 pounds frequently; (2) sitting for six hours during
            an 8-hour workday; (3) standing and/or walking limited to a combined
            total of four hours during an 8-hour workday; (4) occasional postural
            activity, climbing ramps and/or stairs, balancing, stooping, kneeling,
            crouching, and crawling; (5) no climbing of ladders, ropes, or
            scaffolds; (6) no exposure to hazards, such as dangerous machinery or
            unprotected heights; (7) no concentrated exposure to vibration; (8)
            occasional use of foot controls on the right; (9) must be permitted the
            opportunity to alternate between sitting and standing for five minutes
            per hour."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     Prior to April 20, 2016, she could perform a significant number of
            jobs that existed in the national economy.  Beginning on April 20,
            2016, there are no jobs that exist in significant numbers in the national
            economy that Plaintiff could perform.

(Doc. #10, *PageID* #s 1807-25).  These main findings led the ALJ to ultimately conclude

that Plaintiff was not under a benefits-qualifying disability prior to April 20, 2016, but

became disabled beginning on that date.  *Id.* at 1824-25.

V.     **Discussion**

The Listing of Impairments "describes impairments the [Social Security Administration] considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Rabbers*, 582 F.3d at 653 (*quoting* 20 C.F.R. § 404.1525(a)).  Each listing identifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3).  The plaintiff bears the burden of establishing that she is disabled under the Listings.  *See Rabbers*, 582 F.3d at 653.

In the present case, ALJ Motta concluded that Plaintiff's musculoskeletal impairments do not meet "the requirements of any impairment or combination of impairments listed in section 1.00, *et seq*, of Appendix 1."  (Doc. #10, *PageID* #1816).  Plaintiff contends that the ALJ erred by finding that her impairments do not meet or medically equal Listing 1.02 or 1.03 and by applying the incorrect standard.

Listing 1.02 provides:

> *Major dysfunction of a joint(s) (due to any cause):*  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.     Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> or
> B.     Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand),

resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

And, Listing 1.03 requires: "*Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint,* with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." *Id.* § 1.03.

Under either listing, an individual must have an "inability to ambulate effectively"—defined by the Social Security Administration as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00B2b1. Ineffective ambulation is generally defined "as having insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities…." *Id.* "*To ambulate effectively,* individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." *Id.* § 1.00B2b2. The Administration provides examples of ineffective ambulation, including, but limited to, "the inability to walk without the use of a walker, two crutches or two canes, … the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* Importantly, "The ability to walk independently about

one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

ALJ Motta found, "[e]ven considering the claimant's rather mild lumbar impairment, the objective and clinical findings do not establish that the claimant cannot ambulate effectively …." (Doc. #10, *PageID* #1816). The ALJ acknowledged that Plaintiff uses a cane when ambulating, but nonetheless concluded, "the medical necessity for an ambulatory device is less than fully supported with the exception of reasonable recovery periods for surgery that did not last for any period approaching 12 consecutive months." *Id.* She later explained, "There is no evidence a cane is mandatory even though for unclear reasons she started using this regularly in the later record, more than 2 years after the alleged disability onset date and was first noted to use a cane regularly in October of 2014 when she went to Dr. Brown's office using a cane and brought disability papers for him to sign." *Id.* at 1818 (citation omitted). Substantial evidence does not support the ALJ's conclusion.

In August 2012, immediately after her knee-replacement surgery, Plaintiff's surgeon, Dr. Cook, noted that her treatment included use of a walker. *Id.* at 1393, 1396. Several months later, when Plaintiff was 9 months "postop procedure," Dr. Cook indicated that her treatment included *use of a cane* and physical therapy (which was put on hold because Plaintiff was not making any progress). *Id.* at 2644. He also noted that Plaintiff was using a JAS brace. *Id.* at 2646. And, four months later—more than one year after her total-knee replacement—Dr. Cook reiterated that her treatment included use of a cane. *Id.* at 2641.

Plaintiff use of a cane (or need for a cane) is also documented elsewhere in the record. Dr. Kramer, an examining consultant, indicated in January 2013 that she was using a cane and was "somewhat slow and unsteady on her feet." *Id.* at 1419. Moreover, Plaintiff's physical therapist noted in August 2012 that Plaintiff was a fall risk. *Id.* at 1020. Likewise, in September 2013, her physical therapist noted that she advised Plaintiff to use her cane for ambulation to help reduce limping and consequently reduce her back pain. *Id.* at 1453. Together, this evidence reveals a medical reason for Plaintiff to use a cane.

The ALJ also found that there was a substantial gap in Plaintiff's treatment from 2014 to 2016. According to the ALJ, Plaintiff only saw Dr. Brown on "several occasions, but those records contain minimal clinical findings and do not support or establish a basis for finding that the claimant could not ambulate effectively at relevant period herein." *Id.* at 1816. Substantial evidence does not support the ALJ's finding.

In 2014 and 2015, Plaintiff saw Dr. Brown twenty-one times—almost every month. Further, during the months that Plaintiff did not see Dr. Brown, she saw Latonya Dunson, a nurse practitioner at Dr. Brown's office (February, September, and October 2014). During those appointments, Dr. Brown documented his clinical findings. For instance, in April 2014, examination revealed tenderness and limited range of motion in Plaintiff's right knee and back pain. *Id.* at 2375-76. A month later, Dr. Brown noted abnormal motor strength, tenderness, limited range of motion, back spasms, pain to palpation, and decreased range of motion. *Id.* at 2373-75. In June 2015, Dr. Brown indicated that, upon exam, Plaintiff was in moderate distress and was chronically ill. *Id.*

13

at 2336-39.  She had limited ambulation with a cane.  *Id.* at 2338.  Her right knee

revealed contracture, malalignment, tenderness, limited range of motion, bony deformity,

and edema.  *Id.* at 2338-39.  Her back showed abnormal lordosis, decreased range of

motion, and bilateral sacroiliac tenderness.  *Id.* at 2339.  In July 2015, Dr. Brown

observed that Plaintiff's right knee exhibited warmth, swelling, crepitus, and retraction 20

degrees.  *Id.* at 2333.  Her right knee had limited range of motion, including decreased

flexion, extension, medial rotation, and lateral rotation.  *Id.* at 2335.  Further, motion

elicited pain.

        Additionally, in 2014, during Plaintiff's "substantial gap" in treatment, she saw

Dr. Soin, a pain specialist, on eight separate occasions.  *Id.* at 1638-65, 2067-77.  In

January 2014, Dr. Soin noted that Plaintiff's right leg was swollen.  *Id.* at 1652.  When he

administered Spurlings test,[3] she had pain radiate down into her opposite limb.  *Id.* at

1653.  There were also some trigger points felt in and around her paraspinal cervical

muscles.  *Id.*  In her lower lumbar spine, he noted pain to palpation.  *Id.*  "Finger to floor

flexion with the knee extended was less than 90 degrees and limited by pain and stiffness,

extension to 30 degrees was limited due to pain, as well as lateral bending to 25 degrees."

*Id.*  Plaintiff's straight leg test was positive and elicited ipsilateral pain in the lower

lumbar spine.  *Id.*  She had "radiculopathic symptoms with pain traveling down the lower

extremity …."  *Id.*  A few days after Plaintiff's first appointment, Dr. Soin performed a

---

[3] According to Dr. Soin, Spurlings test is "performed by extending the neck, rotating the head, and then [applying] downward pressure on [the] head."  (Doc. #10, *PageID* #1653).

transforaminal epidural steroid injection.  *Id.* at 1648.  Two weeks later, she had a second injection.  *Id.* at 1645.

In February 2014, Plaintiff's exam yielded almost identical results.  *Id.* at 1641-43.
Dr. Soin noted that injections only helped short term.  *Id.* at 1643.  On February 25, 2014,
Dr. Soin performed a nerve block.  *Id.* at 1638.  Unfortunately, Plaintiff's pain continued,
as did her limitations.  In March 2014, Dr. Soin similarly noted, "Finger to floor flexion
with the knee extended was less than 90 degrees and limited by pain and stiffness,
extension to 30 degrees was limited due to pain, as well as lateral bending to 25 degrees."
*Id.* at 2073.  Dr. Soin performed a facet injection procedure in May 2014 and a second in
September 2014.  *Id.* at 2067, 2075.  In sum, Dr. Brown and Dr. Soin's treatment notes
indicate Plaintiff received treatment in 2014 and 2015, and both documented significant
clinical findings.  Accordingly, substantial evidence does not support the ALJ's
conclusion that there was a substantial gap in Plaintiff's treatment during 2014 and 2015
with little clinical findings.

The ALJ found that even if Plaintiff preferred to use a cane, the record does not
establish that an ambulatory device effecting the use of both hands is necessary."  But an
individual who does not use a two-handed assistive device can be found unable to
ambulate effectively.  *See Dobson v. Astrue*, 267 F. App'x 610, 612 (9th Cir. 2008) ("The
full definition of 'inability to ambulate effectively' in Listing 1.00B2b and the
Commissioner's commentary on effective ambulation in the Federal Register make clear,
however, that the use of a two-handed assistive device is not necessary to establish
ineffective ambulation under this Listing."); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.

2009) ("The regulations state that 'ineffective ambulation' is 'defined generally' as requiring the use of a hand-held assistive device that limits the functioning of both upper extremities. But the regulations further provide a nonexhaustive list of examples of ineffective ambulation, such as … the inability to walk a block at a reasonable pace on rough or uneven surfaces ….") (citation omitted); *Siefert v. Comm'r of Soc. Sec.*, No. 2:16-CV-162, 2017 WL 2828733, at *5 (S.D. Ohio June 30, 2017) (Kemp, M.J.) *report and recommendation adopted*, 2017 WL 4083583 (S.D. Ohio Sept. 14, 2017) (Marbley, D.J.) ("Walking with two hand-held assistive devices is not the only way to satisfy that criterion. Section 1.00B2b explicitly says that examples of such an inability 'include, *but are not limited to*, the inability to walk without the use of a walker, two crutches, or two canes ….'"); *Laurain v. Comm'r of Soc. Sec.*, No. 17-13462, 2019 WL 472308, at *8 (E.D. Mich. Jan. 3, 2019), *report and recommendation adopted*, 2019 WL 462981 (E.D. Mich. Feb. 6, 2019) ("Listing 1.00B2b(2) notes that 'ineffective ambulation' is not limited to 'the inability to walk without the use of a walker, two crutches or two canes,' but can include, for example, 'the inability … to use standard public transportation ….'" (citation omitted); *but c.f. Mills v. Comm'r of Soc. Sec.*, No. 1:11-CV-321, 2012 WL 1715042, at *9 (S.D. Ohio May 15, 2012), *report and recommendation adopted*, 2012 WL 4009081 (S.D. Ohio Aug. 29, 2012) ("[T]he ALJ's determination that plaintiff's knee impairment does not meet or equal Listing 1.02(A) finds substantial support in the record. There is no evidence plaintiff has 'an extreme limitation of the ability to walk' as defined under 1.00(B)(2)(b)(l) as she does not require the use 'of a hand-held assistive device(s) that limits the functioning of both upper extremities.'"). Indeed, the

Regulations set forth several examples of ineffective ambulation; for instance, "the inability to walk without the use of a walker, two crutches or two canes, … the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b2.

The record establishes that Plaintiff had "an extreme limitation of the ability to walk" during the time period in question.  *Id.* § 1.00B2b1.  After her total right-knee arthroplasty, she was unable to completely straighten her leg.  This led to two manipulations under anesthesia—on August 7, 2012 and September 21, 2012.  (Doc. #10, *PageID* #s 854, 1399).  Despite those manipulations and "aggressive physical therapy," Plaintiff continued to experience decreased range of motion and persistent pain.  *Id.* at 1387, 1390, 1395, 2641.  At the time of the hearing, she used a cane and wore a knee brace to help her walk.  *Id.* at 1860.

Importantly, however, Plaintiff's right knee issues are not the only reason she uses a cane.  Plaintiff has problems with her back, right hip, and left knee.  The ALJ recognized, "[Plaintiff] has mild degenerative changes in the lumbar spine, right hip, and left knee."  *Id.* at 1816.  However, the ALJ minimized these conditions.

For example, in September 2013, Dr. Le noted that Plaintiff had a positive straight leg raise on the right side and quad atrophy.  *Id.* at 1748.  She had "persistent pain in the knee area but more so up and proximally in the right buttock."  *Id.*  Dr. Le opined that her pain was consistent with sciatica.  *Id.*  In January 2014, Dr. Soin indicated that her straight leg raise was positive and it elicited ipsilateral pain in the lower lumbar spine.  *Id.*

at 1653.  She had radiculopathic symptoms with pain traveling down her leg.  *Id.*

Further, Plaintiff reported intermittent numbness and tingling in her leg.  *Id.*  In

November 2014, Dr. Brown indicated that Plaintiff's symptoms include weakness and

numbness of her legs and feet.  *Id.* at 2258.  Likewise, in February 2015, Dr. Brown

noted that Plaintiff has lower extremity weakness.  *Id.* at 2350.  Because of Plaintiff's

right sciatic nerve pain, when she sits, she leans to the left.  *Id.* at 2350.  An MRI of

Plaintiff's lumbar spine revealed mild-to-moderate lumbar spondylotic changes.  *Id.* at

1698.  In addition, an x-ray of Plaintiff's right hip revealed mild-to-moderate narrowing

of her right hip joint space with associated bony spurring of the acetabulum and mild

sclerosis of the femoral head.  *Id.* at 2399.

      Together, these impairments seriously interfere with Plaintiff's ability to carry out

activities of daily living.  Plaintiff testified that she uses a cart at the grocery store so that

she does not fall.  *Id.* at 1861.  Further, she cannot climb stairs without using a handrail.

*Id.* at 1860; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b2 ("examples of

ineffective ambulation include, but are not limited to … the inability to carry out routine

ambulatory activities, such as shopping and banking, and the inability to climb a few

steps at a reasonable pace with the use of a single hand rail.").

      Her daughter takes care of most of the chores—including laundry and cooking—

around their apartment.  (Doc. #10, *PageID* #s 1855-56).  Plaintiff does not prepare meals

because she cannot stand up a lot to cook.  If she makes any food, it is a sandwich or

something in the microwave.  *Id.* at 1855.  She is able to shower and can generally dress

herself.  *Id.* at 1857.  She has trouble putting on stockings and her sister helps her get

dressed for work. *Id.* When Plaintiff goes to work, she does not take her medication so she is able to function. *Id.* at 1859. As a result, she is in a substantial amount of pain. *Id.* at 1859-60. She only drives three times a week, and her mother drives her everywhere else. *Id.* at 1841. Together, this evidence demonstrates that Plaintiff has an inability to ambulate effectively.

Turning to Listing 1.03's other requirement, Plaintiff must have had reconstructive surgery … of a major weight-bearing joint. And she did. On July 2, 2012, Dr. Cook performed a total right-knee arthroplasty—also known as a knee replacement. (Doc. #10, *PageID* #804); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(F) ("*Major joints* refers to the major peripheral joints, which are the … knee….").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

Under Sentence 4 of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 410 (6th Cir. 2009); *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). "Generally, benefits may be awarded immediately 'only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 865 (6th Cir. 2011) (quoting, in part, *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). "A judicial award of benefits

is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains overwhelming evidence, or strong evidence while contrary evidence is lacking, that Plaintiff met the criteria of Listing 1.03 for the time period between June 18, 2012 and April 20, 2016.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be **REVERSED**;

2. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

3. The case be terminated on the Court's docket.


August 9, 2019                                        *s/Sharon L. Ovington*
                                                     Sharon L. Ovington
                                                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).